1  **DAVID M.C. PETERSON**
   California State Bar No. 254498
2  FEDERAL DEFENDERS OF SAN DIEGO, INC.
   225 Broadway, Suite 900
3  San Diego, California  92101-5008
   Telephone:  (619) 234-8467
4  david_peterson@fd.org

5  Attorneys for Mr. Fernandez

6

7

8                        UNITED STATES DISTRICT COURT

9                       SOUTHERN DISTRICT OF CALIFORNIA

10                      **(HONORABLE JOHN A. HOUSTON)**

11  UNITED STATES OF AMERICA,           )   Case No.:  08cr0802-JAH
                                        )
12            Plaintiff,                )   Date:     April 21, 2008
                                        )   Time:     8:30 a.m.
13  v.                                  )
                                        )
14  JOSE JUAN FERNANDEZ,                )   **STATEMENT OF FACTS AND POINTS AND**
                                        )   **AUTHORITIES IN SUPPORT OF MOTIONS**
15            Defendant.                )
                                        )
16  ─────────────────────────────────────

17                                  **I.**

18                       **STATEMENT OF FACTS**[1]

19        On March 5, 2008, at approximately 6:30 a.m., Jose Juan Fernandez attempted to enter the United

20  States through the Secure Electronic Network for Travelers Rapid Inspection (SENTRI) Lane at the San

21  Ysidro, California Port of Entry.  Mr. Fernandez was the driver of a 1986 Toyota pickup truck.  Because Mr.

22  Fernandez was not enrolled in the SENTRI program or authorized to use its lanes, Customs and Border

23  Patrol (CBP) Officer Exconde told him he was unauthorized to use the SENTRI lane and ordered him to

24  secondary inspection.  At secondary inspection, the officers used a narcotic detection dog to screen the

25  pickup.  While Mr. Fernandez was at secondary, Agent Boutwell asked Mr. Fernandez questions about his

26  ─────────────────────

27        [1]  The facts alleged in these motions are subject to elaboration and/or modification at the time these
    motions are heard.  Mr. Fernandez reserves the right to take a position contrary to the following statement
28  of facts at the motions hearing and at trial.  Because he has to date received limited discovery, the
    statement of facts, and the quotations, are taken from the complaint's statement of facts signed by the
    Magistrate Court and initial discovery received in the case.

1    ownership of the vehicle, to which he responded.  The canine responded to the front wall of the bed of the

2    truck.  The agents searched the Toyota truck.  CBP officers discovered 25 packages of what is alleged to be

3    marijuana, weighing 52.4 kilograms.  At some later time, and outside the presence of Mr. Fernandez, agents

4    searched Mr. Fernandez' cellular telephone ("cell phone") and wrote down data contained within the cell

5    phone.  See Exh. A, attached hereto.  On March 13, Mr. Fernandez was indicted by the January 2007 Grand

6    Jury for Importation of Marijuana and Possession of Marijuana with Intent to Distribute.[2]  On April 1, 2008,

7    Mr. Fernandez received 71 pages of discovery.  He awaits further production, including but not limited to

8    TECS reports of both himself and the truck's prior crossings, the secondary referral slip, and his reports

9    arising out of the search of his cellular telephone.  These motions follow.

10                                                      **II.**

11   **THE COURT SHOULD DISMISS THE INDICTMENT BECAUSE 21 U.S.C. §§ 841 AND 960**
     **ARE FACIALLY UNCONSTITUTIONAL; ALTERNATIVELY, THE COURT SHOULD**
12   **REQUIRE THE GOVERNMENT TO PROVE THAT MR. FERNANDEZ  KNEW THE**
     **QUANTITY AND TYPE OF CONTROLLED SUBSTANCE THAT HE ALLEGEDLY**
13                                            **POSSESSED.**

14          As the Court is fully aware of the issues in this context, Mr. Fernandez will be brief (but will submit

15   further briefing if the Court would like).  First, the indictment should be dismissed because sections 841 and

16   960 of Title 21 are facially unconstitutional as they require a judge, rather than a jury, to determine the

17   weight and quantity of drug involved, which in turn determines the maximum (and minimum mandatory)

18   sentence.  See Apprendi v. New Jersey, 530 U.S. 466 (2000); but see e.g. United States v. Navarro-Vargas,

19   408 F.3d 1184, 1208-09 (9th Cir. 2005).  Second, if the Court disagrees with this, the government must

20   establish mens rea (i.e., knowledge) with respect to drug type and quantity.  Given this, the indictment must

21   be dismissed because the government likely failed to instruct the grand jury accordingly.  Mr. Fernandez

22   requests that the Court compel production of the grand jury transcripts, pursuant to Rule 6(e)(3)(E)(ii), with

23   respect to this motion.

24                                                     **III.**

25         **THE INDICTMENT SHOULD BE DISMISSED BECAUSE JUDGE BURNS'**

26

27         _____

28         [2] For purposes of space and efficiency, Mr. Fernandez refers the court to Exhibits B and C, attached
     hereto, for factual claims made in his Motion to Dismiss the Indictment.

1    **INSTRUCTIONS AS A WHOLE PROVIDED TO THE JANUARY 2007 GRAND JURY RUN
     AFOUL OF BOTH *NAVARRO-VARGAS* AND *WILLIAMS* AND VIOLATE THE FIFTH**
2    **AMENDMENT BY DEPRIVING MR. FERNANDEZ OF THE TRADITIONAL FUNCTIONING
     OF THE GRAND JURY.**
3

4    **A.    Introduction.**

5           The indictment in the instant case was returned by the January 2007 grand jury.  See Clerk's Record

6    at 6.  That grand jury was instructed by the Honorable Larry A. Burns, United States District Court Judge

7    on January 11, 2007.  See Reporter's Partial Transcript of the Proceedings, dated January 11, 2007 (Exhibit

8    B hereto).  Judge Burns' instructions to the impaneled grand jury deviate from the form grand jury

9    instructions narrowly approved by the en banc Ninth Circuit in several significant ways.  United States v.

10   Cortez-Rivera, 454 F.3d 1038 (9th Cir. 2006); United States v. Navarro-Vargas, 408 F.3d 1184 (9th Cir.)

11   (en banc), cert. denied, 126 S. Ct. 736 (2005) (Navarro-Vargas II); United States v. Navarro-Vargas, 367

12   F.3d 896 (9th Cir. 2004) (Navarro-Vargas I); United States v. Marcucci, 299 F.3d 1156 (9th Cir. 2002) (per

13   curiam).  First, Judge Burns instructed Grand Jurors that it was their singular duty to determine probable

14   cause, and that they have no right to decline to indict when probable cause is met.  Second, Judge Burns

15   posited a non-existent prosecutorial duty to disclose exculpatory evidence to the grand jury. The instructions

16   went further than those approved by the Ninth Circuit, and run afoul of both Navarro-Vargas II and Vasquez

17   v. Hillery, 474 U.S. 254 (1986).  In addition, Judge Burns' instructions during impanelment compounded

18   his erroneous instructions and comments to prospective grand jurors during voir dire of the grand jury panel,

19   which immediately preceded the impanelment instructions at Exh. B.  See Reporter's Transcript of

20   Proceedings, dated January 11, 2007 (Exhibit C hereto).

21         **1.    Judge Burns Instructed Grand Jurors That Their Singular Duty Is to
                   Determine Whether or Not Probable Cause Exists and That They Have
22                 No Right to Decline to Indict When the Probable Cause Standard Is
                   Satisfied.**
23

24          After repeatedly emphasizing to the grand jurors that a determination of probable cause was their

25   sole responsibility, see Exh. B at 3, 3-4, 5,[3] Judge Burns instructed the grand jurors that they were forbidden

26   "from judg[ing] the wisdom of the criminal laws enacted by Congress; that is, whether or not there should

27   _____

28          [3]  See also id. at 20 ("You're all about probable cause.").

be a federal law or should not be a federal law designating certain activity [as] criminal is not up to you." See id. at 8. The Court goes on to instruct the grand jurors that, should "you disagree with that judgment made by Congress, then your option is not to say 'well, I'm going to vote against indicting even though I think that the evidence is sufficient' or 'I'm going to vote in favor of even though the evidence may be insufficient.'" See id. at 8-9. Thus, the instruction flatly bars the grand jury from declining to indict because the grand jurors disagree with a proposed prosecution.

Immediately before limiting the grand jurors' powers in the way just described, Judge Burns referred to an instance in the grand juror selection process in which it excused three potential jurors:

> I've gone over this with a couple of people. You understood from the questions and answers that a couple of people were excused, I think three in this case, because they could not adhere to the principle that I'm about to tell you.

Id. at 8. That "principle" was Judge Burns' discussion of the grand jurors' inability to give effect to their disagreement with Congress. See id. at 8-9. Thus, Judge Burns not only instructed the grand jurors on its view of their discretion; it enforced that view on pain of being excused from service as a grand juror.

Examination of the voir dire transcript, which contains additional instructions and commentary in the form of the give and take between Judge Burns and various prospective grand jurors, reveals how Judge Burns' emphasis that the jurors' singular duty is to determine whether or not probable cause exists and his statement that grand jurors cannot judge the wisdom of the criminal laws enacted by Congress merely compounded an erroneous series of instructions already given to the grand jury venire. In one of its earliest substantive remarks, Judge Burns makes clear that the grand jury's sole function is probable cause determination.

> [T]he grand jury is determining really two factors: "do we have a reasonable belief that a crime was committed? And second, do we have a reasonable belief that the person that they propose that we indict committed the crime?"
> If the answer is "yes" to both of those, then the case should move forward. If the answer to either of the questions is "no," then the grand jury should not hesitate and not indict.

See Exh. C at 8. In this passage, Judge Burns twice uses the term "should" in a context makes clear that the term is employed to convey instruction: "should" cannot reasonably be read to mean optional when it addresses the obligation not to indict when the grand jury has no "reasonable belief that a crime was

08cr0802-JAH

1    committed" or if it has no "reasonable belief that the person that they propose that we indict committed the

2    crime." Id.

3        Equally revealing are Judge Burns' interactions with two potential grand jurors who indicated that,

4    in some unknown set of circumstances, they might decline to indict even where there was probable cause.

5    Because of the redactions of the grand jurors' names, Mr. Fernandez will refer to them by occupation. One

6    is a retired clinical social worker (hereinafter CSW), and the other is a real estate agent (hereinafter REA).

7    The CSW indicated a view that no drugs should be considered illegal and that some drug prosecutions were

8    not an effective use of resources. See id. at 16. The CSW was also troubled by certain unspecified

9    immigration cases. See id.

10       Judge Burns made no effort to determine what sorts of drug and immigration cases troubled the

11   CSW. It never inquired as to whether the CSW was at all troubled by the sorts of cases actually filed in this

12   district, such as drug smuggling cases and cases involving reentry after deportation and alien smuggling.

13   Rather, it provided instructions suggesting that, in any event, any scruples CSW may have possessed were

14   simply not capable of expression in the context of grand jury service.

15       Now, the question is can you fairly evaluate [drug cases and immigration cases]? Just as the
         defendant is ultimately entitled to a fair trial and the person that's accused is entitled to a fair
16       appraisal of the evidence of the case that's in front of you, so, too, is the United States
         entitled to a fair judgment. If there's probable cause, then the case should go forward. *I*
17       *wouldn't want you to say*, "well, yeah, there's probable cause, but I still don't like what our
         government is doing. I disagree with these laws, so I'm not going to vote for it to go
18       forward." If that is your frame of mind, then probably you shouldn't serve. Only you can tell
         me that.

19

20   See id. at 16-17 (emphasis added). Thus, without any sort of context whatsoever, Judge Burns let the grand

21   juror know that it would not want him or her to decline to indict in an individual case where the grand juror

22   "[didn't] like what our government is doing," see id. at 17, but in which there was probable cause. Id. Such

23   a case "should go forward." Id. Given that blanket proscription on grand juror discretion, made manifest

24   by Judge Burns' use of the pronoun "I", the CSW indicated that it "would be difficult to support a charge

25   even if [the CSW] thought the evidence warranted it." Id. Again, Judge Burns' question provided no

26   context; Judge Burns inquired regarding "a case," a term presumably just as applicable to possession of a

27   small amount of medical marijuana as kilogram quantities of methamphetamine for distribution. Any grand

28

juror listening to this exchange could only conclude that there was *no* case in which Judge Burns would

permit them to vote "no bill" in the face of a showing probable cause.

Just in case there may have been a grand juror that did not understand his or her inability to exercise

anything like prosecutorial discretion, Judge Burns drove the point home in its exchange with REA.  REA

first advised Judge Burns of a concern regarding the "disparity between state and federal law" regarding

"medical marijuana."  See id. at 24.  Judge Burns first sought to address REA's concerns about medical

marijuana by stating that grand jurors, like trial jurors, are simply forbidden from taking penalty

considerations into account.

> Well, those things -- the consequences of your determination shouldn't concern you in the
> sense that penalties or punishment, things like that -- we tell trial jurors, of course, that they
> cannot consider the punishment or the consequence that Congress has set for these things.
> We'd ask you to also abide by that.  We want you to make a business-like decision of whether
> there was a probable cause. . . .

Id. at 24-25.  Having stated that REA was to "abide" by the instruction given to trial jurors, Judge Burns

went on to suggest that REA recuse him or herself from medical marijuana cases.  See id. at 25.

In response to further questioning, REA disclosed REA's belief "that drugs should be legal." See id.

That disclosure prompted Judge Burns to begin a discussion that ultimately led to an instruction that a grand

juror is obligated to vote to indict if there is probable cause.

> I can tell you sometimes I don't agree with some of the legal decisions that are indicated that
> I have to make.  But my alternative is to vote for someone different, vote for someone that
> supports the policies I support and get the law changed.  It's not for me to say, "well, I don't
> like it.  So I'm not going to follow it here."
>
> You'd have a similar obligation as a grand juror even though you might have to grit your
> teeth on some cases.  Philosophically, if you were a member of congress, you'd vote against,
> for example, criminalizing marijuana.  I don't know if that's it, but you'd vote against
> criminalizing some drugs.
>
> That's not what your prerogative is here.  You're prerogative instead is to act like a judge and
> say, "all right.  This is what I've to  deal with objectively.  Does it seem to me that a crime
> was committed?  Yes.  Does it seem to me that this person's involved?  It does." *And then
> your obligation, if you find those to be true, would be to vote in favor of the case going
> forward.*

Id. at 26-27 (emphasis added).  Thus, the grand juror's duty is to conduct a simple two question test, which,

if both questions are answered in the affirmative, lead to an "obligation" to indict.  Id.

Having set forth the duty to indict, and being advised that REA was "uncomfortable" with that paradigm, Judge Burns then set about to ensure that there was no chance of a deviation from the obligation to indict in every case in which there was probable cause.

> The Court: Do you think you'd be inclined to let people go in drug cases even though you were convinced there was probable cause they committed a drug offense?
> REA: It would depend on the case.
> The Court: Is there a chance that you would do that?
> REA: Yes.
> The Court: I appreciate your answers. I'll excuse you at this time.

Id. at 27. Two aspects of this exchange are crucial. First, REA plainly does not intend to act solely on his political belief in decriminalization -- whether he or she would indict "depend[s] on the case," see id., as it should. Because REA's vote "depend[s] on the case," see id., it is necessarily true that REA would vote to indict in some (perhaps many or even nearly all) cases in which there was probable cause. Again, Judge Burns made no effort to explore REA's views; it did not ascertain what sorts of cases would prompt REA to hesitate. The message is clear: it does not matter what type of case might prompt REA's reluctance to indict because, once the two part test is satisfied, the "obligation" is "to vote in favor of the case going forward."[4] See id. at 27. That is why even the "chance," see id., that a grand juror might not vote to indict was too great a risk to run.

### 2. The Instructions Posit a Non-Existent Prosecutorial Duty to Offer Exculpatory Evidence.

In addition to its instructions on the authority to choose not to indict, Judge Burns also assured the grand jurors that prosecutors would present to them evidence that tended to undercut probable cause. See Exh. B at 20.[5]

---

[4] This point is underscored by Judge Burns' explanation to the Grand Jury that a magistrate judge will have determined the existence of probable cause "in most circumstances" before it has been presented with any evidence. See Exh. B at 6. This instruction created an imprimatur of finding probable cause in each case because had a magistrate judge not so found, the case likely would not have been presented to the Grand Jury for indictment at all. The Grand Jury was informed that it merely was redundant to the magistrate court "in most circumstances." See id. This instruction made the grand jury more inclined to indict irrespective of the evidence presented.

[5] These instructions were provided in the midst of several comments that praised the United States attorney's office and prosecutors in general. Judge Burns advised the grand jurors that they "can expect

1  Now, again, this emphasizes the difference between the function of the grand jury and the
   trial jury. You're all about probable cause. If you think that there's evidence out there that
2  might cause you to say "well, I don't think probable cause exists," then it's incumbent upon
   you to hear that evidence as well. As I told you, in most instances, *the U.S. Attorneys are
3  duty-bound to present evidence that cuts against what they may be asking you to do if they're
   aware of that evidence.*

4

5  Id. (emphasis added).

6       The antecedent to this instruction is also found in the voir dire. After advising the grand jurors that

7  "the presentation of evidence to the grand jury is necessarily one-sided," see Exh. C at 14, Judge Burns

8  gratuitously added that "[his] experience is that the prosecutors don't play hide-the-ball. If there's something

9  adverse or that cuts against the charge, you'll be informed of that. They have a duty to do that." See id.

10 Thus, Judge Burns unequivocally advised the grand jurors that the government would present any evidence

11 that was "adverse" or "that cuts against the charge." See id.

12 **B.    *Navarro-Vargas* Establishes Limits on the Ability of Judges to Constrain the Powers of
       the Grand Jury, Which Judge Burns Far Exceeded in Its Instructions as a Whole
13     During Impanelment.**

14

15 that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and . . . they'll
   act in good faith in all matters presented to you." See Exh. B at 27. The instructions delivered during
16 voir dire go even further. In addressing a prospective grand juror who revealed "a strong bias for the U.S.
   Attorney, whatever cases they might bring," see Exh. C at 38, Judge Burns affirmatively endorsed the
17 prospective juror's view of the U.S. Attorney's office, even while purporting to discourage it: "frankly,
   I agree with the things you are saying. They make sense to me." See id. at 43. See also id. at 40 ("You
18 were saying that you give a presumption of good faith to the U.S. Attorney and assume, quite logically,
   that they're not about the business of trying to indict innocent people or people that they believe to be
19 innocent or the evidence doesn't substantiate the charges against.").

20     Judge Burns' discussion of once having been a prosecutor before the Grand Jury compounded the
   error inherent of praising the government attorneys. See Exh. B at 9-10. Judge Burns' instructions
21 implied that as a prior prosecutor and current "jury liaison judge," see id. at 8, it would not allow the
   government attorneys to act inappropriately or to present cases for indictment where no probable cause
22 existed.

23     In addition, while Judge Burns instructed the Grand Jury that it had the power to question
   witnesses, Judge Burns' instructions also told the Grand Jury that it should "be deferential to the U.S.
24 Attorney if there is an instance where the U.S. Attorney thinks a question ought not to be asked." See
   Exh. B at 12. As the dissent in Navarro-Vargas pointed out, "the grand jury's independence is diluted
25 by [such an] instruction, which encourages deference to prosecutors." Navarro-Vargas, 408 F.3d at 1215.
   The judge's admonition that his statement was only "advice," see Ex A at 12, does not cure the error as
26 courts regularly presume grand jurors follow instructions provided to them by the court. See id. at 1202,
   n.23 ("We must presume that grand jurors will follow instructions because, in fact, we are prohibited
27 from examining jurors to verify whether they understood the instruction as given and then followed it.").

28

08cr0802-JAH

The Ninth Circuit has, over vigorous dissents, rejected challenges to various instructions given to grand jurors in the Southern District of California. See Navarro-Vargas II, 408 F.3d 1184. While the Ninth Circuit has thus far (narrowly) rejected such challenges, it has, in the course of adopting a highly formalistic approach[6] to the problems posed by the instructions, endorsed many of the substantive arguments raised by the defendants in those cases. The district court's instructions cannot be reconciled with the role of the grand jury as set forth in Navarro-Vargas II. Taken together, the voir dire of and instructions given to the January 2007 Grand Jury, go far beyond those at issue in Navarro-Vargas, taking a giant leap in the direction of a bureaucratic, deferential grand jury, focused solely upon probable cause determinations and utterly unable to exercise any quasi-prosecutorial discretion. That is not the institution the Framers envisioned. See United States v. Williams, 504 U.S. 36, 49 (1992). For instance, with respect to the grand jury's relationship with the prosecution, the Navarro-Vargas II majority acknowledges that the two institutions perform similar functions: "'the public prosecutor, in deciding whether a particular prosecution shall be instituted or followed up, performs much the same function as a grand jury.'" Navarro-Vargas II, 408 F.3d at 1200 (quoting Butz v. Economou, 438 U.S. 478, 510 (1978)). Accord United States v. Navarro-Vargas, 367 F.3d 896, 900 (9th Cir. 2004) (Navarro-Vargas I)(Kozinski, J., dissenting) (the grand jury's discretion in this regard "is most accurately described as prosecutorial." ).  See also Navarro-Vargas II, 408 F.3d at 1213 (Hawkins, J., dissenting).  It recognizes that the prosecutor is not obligated to proceed on any indictment or presentment returned by a grand jury, id., but also that "the grand jury has no obligation to prepare a presentment or to return an indictment drafted by the prosecutor."  Id.  See Niki Kuckes, The Democratic Prosecutor: Explaining the Constitutional Function of the Federal Grand Jury, 94 Geo. L.J. 1265, 1302 (2006) (the grand jury's discretion not to indict was "'arguably . . . the most important attribute of grand jury review from the perspective of those who insisted that a grand jury clause be included in the Bill of Rights'") (quoting Wayne LaFave et al., Criminal Procedure § 15.2(g) (2d ed. 1999)).

---

[6] See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (criticizing the majority because "[t]he instruction's use of the word 'should' is most likely to be understood as imposing an inflexible 'duty or obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional independence.").

1    Indeed, the Navarro-Vargas II majority agrees that the grand jury possesses all the attributes set forth

2  in Vasquez v. Hillery, 474 U.S. 254 (1986).  See id.

3          The grand jury thus determines not only whether probable cause exists, but also whether to
           "charge a greater offense or a lesser offense; numerous counts or a single count; and perhaps
4          most significant of all, a capital offense or a non-capital offense -- all on the basis of the
           same facts.  And, significantly, the grand jury may refuse to return an indictment even
5          "'where a conviction can be obtained.'"

6  Id. (quoting Vasquez, 474 U.S. at 263).  The Supreme Court has itself reaffirmed Vasquez's description of

7  the grand jury's attributes in Campbell v. Louisiana, 523 U.S. 392 (1998), noting that the grand jury "controls

8  not only the initial decision to indict, but also significant questions such as how many counts to charge and

9  whether to charge a greater or lesser offense, including the important decision whether to charge a capital

10  crime."  Id. at 399 (citing Vasquez, 474 U.S. at 263).  Judge Hawkins notes that the Navarro-Vargas II

11  majority accepts the major premise of Vasquez: "the majority agrees that a grand jury has the power to refuse

12  to indict someone even when the prosecutor has established probable cause that this individual has

13  committed a crime."  See id. at 1214 (Hawkins, J. dissenting).  Accord Navarro-Vargas I, 367 F.3d at 899

14  (Kozinski, J., dissenting); United States v. Marcucci, 299 F.3d 1156, 1166-73 (9th Cir. 2002) (per curiam)

15  (Hawkins, J., dissenting).    In short, the grand jurors' prerogative not to indict, probable cause

16  notwithstanding, enjoys strong support in the Ninth Circuit.  But not in Judge Burns' instructions.

17  **C.    Judge Burns' Instructions Forbid the Exercise of Grand Jury Discretion Established
          in Both *Vasquez* and *Navarro-Vargas II*.**

18

19    The Navarro-Vargas II majority found that the instruction in that case "leave[s] room for the grand

20  jury to dismiss even if it finds probable cause," 408 F.3d at 1205, adopting the analysis in its previous

21  decision in Marcucci.  Marcucci reasoned that the instructions do not mandate that grand jurors indict upon

22  every finding of probable cause because the term "should" may mean "what is probable or expected."  299

23  F.3d at 1164 (citation omitted).  That reading of the term "should" makes no sense in context, as Judge

24  Hawkins ably pointed out.  See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) ("The

25  instruction's use of the word 'should' is most likely to be understood as imposing an inflexible 'duty or

26  obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional independence.").  See

27  also id. ("The 'word' should is used to express a duty [or] obligation.") (quoting The Oxford American

28  Diction and Language Guide 1579 (1999) (brackets in original)).

The debate about what the word "should" means, however, is irrelevant here; the instructions here make no such fine distinction. The grand jury instructions make it painfully clear that grand jurors simply may not choose not to indict in the event of what appears to them to be an unfair application of the law: should "you disagree with that judgment made by Congress, then your option is not to say 'well, I'm going to vote against indicting even though I think that the evidence is sufficient'...." See Exh. B at 8-9. Thus, the instruction flatly bars the grand jury from declining to indict because they disagree with a proposed prosecution. No grand juror would read this language as instructing, or even allowing, him or her to assess "the need to indict." Vasquez, 474 U.S. at 264.

While Judge Burns used the word "should" instead of "shall" during voir dire with respect to whether an indictment was required if probable cause existed, see Exh. C at 4, 8, in context, it is clear that it could only mean "should" in the obligatory sense. For example, when addressing a prospective juror, Judge Burns not only told the jurors that they "should" indict if there is probable cause, it told them that if there is not probable cause, "then the grand jury should hesitate and not indict." See id. at 8. At least in context, it would strain credulity to suggest that Judge Burns was using "should" for the purpose of "leaving room for the grand jury to [indict] even if it finds [no] probable cause." See Navarro-Vargas, 408 F.3d at 1205. Clearly it was not.

The full passage cited above effectively eliminates any possibility that Judge Burns intended the Navarro-Vargas spin on the word "should."

> [T]he grand jury is determining really two factors: "do we have a reasonable belief that a crime was committed? And second, do we have a reasonable belief that the person that they propose that we indict committed the crime?"
>
> If the answer is "yes" to both of those, then the case should move forward. If the answer to either of the questions is "no," then the grand jury should not hesitate and not indict.

See Exh. C at 8. Of the two sentences containing the word "should," the latter of the two essentially states that if there is no probable cause, you *should* not indict. Judge Burns could not possibly have intended to "leav[e] room for the grand jury to [indict] even if it finds [no] probable cause." See Navarro-Vargas, 408 F.3d at 1205 (citing Marcucci, 299 F.3d at 1159). That would contravene the grand jury's historic role of protecting the innocent. See, e.g., United States v. Calandra, 414 U.S. 338, 343 (1974) (The grand jury's

1   "responsibilities continue to include both the determination whether there is probable cause and the

2   protection of citizens against unfounded criminal prosecutions.") (citation omitted).

3       By the same token, if Judge Burns said that "the case should move forward" if there is probable

4   cause, but intended to "leav[e] room for the grand jury to dismiss even if it finds probable cause," see

5   Navarro-Vargas, 408 F.3d at 1205 (citing Marcucci, 299 F.3d at 1159), then it would have to have intended

6   two different meanings of the word "should" in the space of two consecutive sentences.  That could not have

7   been its intent.  But even if it were, no grand jury could ever have had that understanding.[7]  Jurors are not

8   presumed to be capable of sorting through internally contradictory instructions.  See generally United States

9   v. Lewis, 67 F.3d 225, 234 (9th Cir. 1995) ("where two instructions conflict, a reviewing court cannot

10  presume that the jury followed the correct one") (citation, internal quotations and brackets omitted).

11      Lest there be any room for ambiguity, on no less than four occasions, Judge Burns made it explicitly

12  clear to the grand jurors that "should" was not merely suggestive, but obligatory:

13      **(1)**     The first occasion occurred in the following exchange when Judge Burns conducted voir dire

14  and excused a potential juror (CSW):

15          The Court: . . . If there's probable cause, then the case should go forward.  I wouldn't want
            you to say, "Well, yeah, there's probable cause.  But I still don't like what the government is
16          doing.  I disagree with these laws, so I'm not going to vote for it to go forward."  If that's your
            frame of mind, then probably you shouldn't serve.  Only you can tell me that.
17          Prospective Juror: Well, I think I may fall in that category.
            The Court: In the latter category?
18          Prospective Juror: Yes.
            The Court: Where it would be difficult for you to support a charge even if you thought the
19          evidence warranted it?
            Prospective Juror: Yes.
20          The Court: I'm going to excuse you then.

21  See Exh. C at 17.  There was nothing ambiguous about the word "should" in this exchange with a

22  prospective juror.  Even if the prospective juror did not like what the government was doing in a particular

23  case, that case "should go forward" and Judge Burns expressly disapproved of any vote that might prevent

24  that.  See id. ("I wouldn't want you [to vote against such a case]").  The sanction for the possibility of

25

26      [7] This argument does not turn on Mr. Fernandez's view that the Navarro-Vargas/Marcucci reading
        of the word "should" in the model instructions is wildly implausible.  Rather, it turns on the context in
27      which the word is employed by Judge Burns here in his unique instructions, context which eliminates the
        Navarro-Vargas/Marcucci reading as a possibility.
28

1   independent judgment was dismissal, a result that provided full deterrence of that juror's discretion and

2   secondary deterrence as to the exercise of discretion by any other prospective grand juror.

3       **(2)**    In an even more explicit example of what "should" meant, Judge Burns makes clear that it

4   there is an unbending obligation to indict if there is probable cause.  Grand jurors have no other prerogative.

5           The Court: . . . It's not for me to say, "Well, I don't like it.  So I'm not going to follow it here."

6   You'd have a similar *obligation* as a grand juror even though you might have to grit your teeth on some cases.  Philosophically, if you were a member of Congress, you'd vote against, for example, criminalizing marijuana.  I don't know if that's it, but you'd vote against

7   criminalizing some drugs.

8           That's not what your *prerogative* is here.  Your prerogative instead is act like a judge and to say, "All right.  This is what I've got to deal with objectively.  Does it seem to me that a

9   crime was committed?  Yes.  Does it seem to me that this person's involved? It does." *And then your obligation, if you find those things to be true, would be to vote in favor of the case*

10  *going forward*.

11  <u>Id.</u> at 26-27 (emphasis added).  After telling this potential juror (REA) what his obligations and prerogatives

12  were, the Court inquired as to whether "you'd be inclined to let people go on drug cases even though you

13  were convinced there was probable cause they committed a drug offense?" <u>Id.</u> at 27.  The potential juror

14  responded: "It would depend on the case." <u>Id.</u>  Nevertheless, that juror was excused. <u>Id.</u> at 28.  Again, in this

15  context, and contrary to the situation in <u>Navarro-Vargas</u>, "should" means "shall"; it is obligatory, and the

16  juror has no prerogative to do anything other than indict if there is probable cause.

17      Moreover, as this example demonstrates, the issue is not limited to whether the grand jury believes

18  a particular law to be "unwise."  This juror said that any decision to indict would not depend on the law, but

19  rather it would "depend on the case."  Thus, it is clear that Judge Burns' point was that if a juror could not

20  indict on probable cause for *every* case, then that juror was not fit for service.  It is equally clear that the

21  prospective juror did not dispute the "wisdom of the law;" he was prepared to indict under some factual

22  scenarios, perhaps many.  But Judge Burns did not pursue the question of what factual scenarios troubled

23  the prospective jurors, because its message is that there is no discretion not to indict.

24      **(3)**    As if the preceding examples were not enough, Judge Burns continued to pound the point

25  home that "should" meant "shall" when it told another grand juror during voir dire: "[W]hat I have to insist

26  on is that you follow the law that's given to us by the United States Congress.  We enforce the federal laws

27  here." <u>See</u> <u>id.</u> at 61.

28

**(4)**    And then again, after swearing in all the grand jurors who had already agreed to indict in every case where there was probable cause, Judge Burns reiterated that "should" means "shall" when it reminded them that "your option is not to say 'well, I'm going to vote against indicting even though I think that the evidence is sufficient . . . . Instead your *obligation* is . . . not to bring your personal definition of what the law ought to be and try to impose that through applying it in a grand jury setting." See Exh. B at 9.

Moreover, Judge Burns advised the grand jurors that they were forbidden from considering the penalties to which indicted persons may be subject.

> Prospective Juror (REA): ... And as far as being fair, it kind of depends on what the case is about because there is a disparity between state and federal law.
> The Court:  In what regard?
> Prospective Juror: Specifically, medical marijuana.
> The Court:  Well, those things -- the consequences of your determination shouldn't concern you in the sense that penalties or punishment, things like that -- *we tell trial jurors, of course, that they cannot consider the punishment or the consequence that Congress has set for these things. We'd ask you to also abide by that.*  We want you to make a business-like decision of whether there was a probable cause. ...

See Exh. C at 24-25 (emphasis added).  A "business-like decision of whether there was a probable cause" would obviously leave no role for the consideration of penalty information.

The Ninth Circuit previously rejected a claim based upon the proscription against consideration of penalty information based upon the same unlikely reading of the word "should" employed in Marcucci.  See United States v. Cortez-Rivera, 454 F.3d 1038, 1040-41 (9th Cir. 2006).  Cortez-Rivera is inapposite for two reasons.  First, Judge Burns did not use the term "should" in the passage quoted above.  Second, that context, as well as its consistent use of a mandatory meaning in employing the term, eliminate the ambiguity (if there ever was any) relied upon by Cortez-Rivera.  The instructions again violate Vasquez, which plainly authorized consideration of penalty information.  See 474 U.S. at 263.

Noting can mask the undeniable fact that Judge Burns explicitly instructed the jurors time and time again that they had a duty, an obligation, and a singular prerogative to indict each and every case where there was probable cause.  These instructions go far beyond the holding of Navarro-Vargas and stand in direct contradiction of the Supreme Court's decision in Vasquez.  Indeed, it defies credulity to suggest that a grand

1  juror hearing these instructions, and that voir dire, could possibly believe what the Supreme Court held in

2  Vasquez:

> 3  The grand jury does not determine only that probable cause exists to believe that a defendant committed a crime, or that it does not. In the hands of the grand jury lies the power to charge
> 4  a greater offense or a lesser offense; numerous counts or a single count; and perhaps most significant of all, a capital offense or a non-capital offense – all on the basis of the same
> 5  facts. Moreover, "[t]he grand jury is not bound to indict in every case where a conviction can be obtained."

6

7  474 U.S. at 263 (quoting United States v. Ciambrone, 601 F.2d 616, 629 (2nd Cir. 1979) (Friendly, J.,

8  dissenting)); accord Campbell v. Louisiana, 523 U.S. 392, 399 (1998) (The grand jury "controls not only

9  the initial decision to indict, but also significant decisions such as how many counts to charge and whether

10  to charge a greater or lesser offense, including the important decision whether to charge a capital crime.").

11  Nor would the January 2007 grand jury ever believe that it was empowered to assess the "the need to indict."

12  See id. at 264. Judge Burns' grand jury is not Vasquez's grand jury. The instructions therefore represent

13  structural constitutional error "that interferes with the grand jury's independence and the integrity of the

14  grand jury proceeding." See United States v. Isgro, 974 F.2d 1091, 1094 (9th Cir. 1992). The indictment

15  must therefore be dismissed. Id.

16      The Navarro-Vargas II majority's faith in the structure of the grand jury *is not* a cure for the

17  instructions excesses. The Navarro-Vargas II majority attributes "[t]he grand jury's discretion -- its

18  independence -- [to] the absolute secrecy of its deliberations and vote and the unreviewability of its

19  decisions." 408 F.3d at 1200. As a result, the majority discounts the effect that a judge's instructions may

20  have on a grand jury because "it is the *structure* of the grand jury process and its *function* that make it

21  independent." Id. at 1202 (emphases in the original).

22      Judge Hawkins sharply criticized this approach. The majority, he explains, "believes that the

23  'structure' and 'function' of the grand jury -- particularly the secrecy of the proceedings and unreviewability

24  of many of its decisions -- sufficiently protects that power." See id. at 1214 (Hawkins, J., dissenting). The

25  flaw in the majority's analysis is that "[i]nstructing a grand jury that it lacks power to do anything beyond

26  making a probable cause determination ... unconstitutionally undermines the very structural protections that

27  the majority believes save[] the instruction." Id. After all, it is an "'almost invariable assumption of the law

28  that jurors follow their instructions.'" Id. (quoting Richardson v. Marsh, 481 U.S. 200, 206 (1987)). If that

1  "invariable assumption" were to hold true, then the grand jurors could not possibly fulfill the role described

2  in Vasquez.  Indeed, "there is something supremely cynical about saying that it is fine to give jurors

3  erroneous instructions because nothing will happen if they disobey them." Id.

4      In setting forth Judge Hawkins' views, Mr. Fernandez understands that Judge Burns may not adopt

5  them solely because the reasoning that supports them is so much more persuasive than the majority's

6  sophistry.  Rather, he sets them forth to urge the Court *not to extend* what is already untenable reasoning.

7      Here, again, the question is not an obscure interpretation of the word "should", especially in light of

8  the instructions and commentary by Judge Burns during voir dire discussed above - unaccounted for by the

9  Court in Navarro-Vargas II because they had not yet been disclosed to the defense, but an absolute ban on

10  the right to refuse to indict that directly conflicts with the recognition of that right in Vasquez, Campbell,

11  and both Navarro-Vargas II opinions.  Navarro-Vargas II is distinguishable on that basis, but not only that.

12      Judge Burns did not limit himself to denying the grand jurors the power that Vasquez plainly states

13  they enjoy.  It also excused prospective grand jurors who might have exercised that Fifth Amendment

14  prerogative, excusing "three [jurors] in this case, because they could not adhere to [that] principle...." See

15  Exh. B at 8; Exh. C at 17, 28.  The structure of the grand jury and the secrecy of its deliberations cannot

16  embolden grand jurors who are no longer there, likely because they expressed their willingness to act as the

17  conscience of the community.  See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (a

18  grand jury exercising its powers under Vasquez "serves ... to protect the accused from the other branches

19  of government by acting as the 'conscience of the community.'") (quoting Gaither v. United States, 413 F.2d

20  1061, 1066 & n.6 (D.C. Cir. 1969)).  The federal courts possess only "very limited" power "to fashion, on

21  their own initiative, rules of grand jury procedure," United States v. Williams, 504 U.S. 36, 50 (1992), and,

22  here, Judge Burns has both fashioned its own rules and enforced them.

**D.    The Instructions Conflict with *Williams*' Holding That There Is No Duty to Present
Exculpatory Evidence to the Grand Jury.**

25      In Williams, the defendant, although conceding that it was not required by the Fifth Amendment,

26  argued that the federal courts should exercise their supervisory power to order prosecutors to disclose

27  exculpatory evidence to grand jurors, or, perhaps, to find such disclosure required by Fifth Amendment

28  common law.  See 504 U.S. at 45, 51.  Williams held that "as a general matter at least, no such 'supervisory'

1   judicial authority exists." <u>See</u> <u>id.</u> at 47.  Indeed, although the supervisory power may provide the authority

2   "to dismiss an indictment because of misconduct before the grand jury, at least where that misconduct

3   amounts to a violation of one of those 'few, clear rules which were carefully drafted and approved by Judge

4   Burns and by Congress to ensure the integrity of the grand jury's functions,'" <u>id.</u> at 46 (citation omitted), it

5   does not serve as "a means of *prescribing* such standards of prosecutorial conduct in the first instance." <u>Id.</u>

6   at 47 (emphasis added).  The federal courts possess only "very limited" power "to fashion, on their own

7   initiative, rules of grand jury procedure." <u>Id.</u> at 50.  As a consequence, <u>Williams</u> rejected the defendant's

8   claim, both as an exercise of supervisory power and as Fifth Amendment common law.  <u>See</u> <u>id.</u> at 51-55.

9        Despite the holding in <u>Williams</u>, the instructions here assure the grand jurors that prosecutors would

10  present to them evidence that tended to undercut probable cause.  <u>See</u> Exh. B at 20.

11  Now, again, this emphasizes the difference between the function of the grand jury and the
    trial jury.  You're all about probable cause.  If you think that there's evidence out there that
12  might cause you say "well, I don't think probable cause exists," then it's incumbent upon you
    to hear that evidence as well.  As I told you, in most instances, *the U.S. Attorneys are duty-*
13  *bound to present evidence that cuts against what they may be asking you to do if they're*
    *aware of that evidence.*
14

15  <u>Id.</u> (emphasis added).  Moreover, the district court later returned to the notion of the prosecutors and their

16  duties, advising the grand jurors that they "can expect that the U.S. Attorneys that will appear in from of

17  [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you." <u>See</u>

18  <u>id.</u> at 27.  The Ninth Circuit has already concluded it is likely this final comment is "unnecessary."  <u>See</u>

19  <u>Navarro-Vargas</u>, 408 F.3d at 1207.

20       This particular instruction has a devastating effect on the grand jury's protective powers, particularly

21  if it is not true.  It begins by emphasizing the message that <u>Navarro-Vargas II</u> somehow concluded was not

22  conveyed by the previous instruction: "You're all about probable cause."  <u>See</u> Exh. B at 20.  Thus, once

23  again, the grand jury is reminded that they are limited to probable cause determinations (a reminder that was

24  probably unnecessary in light of the fact that Judge Burns had already told the grand jurors that they likely

25  would be excused if they rejected this limitation).  The instruction goes on to tell the grand jurors that they

26  should consider evidence that undercuts probable cause, but also advises the grand jurors that the prosecutor

27  will present it.  The end result, then, is that grand jurors should consider evidence that goes against probable

28  cause, but, if none is presented by the government, they can  presume that there is none.  After all, "in most

1    instances, the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking

2    you to do if they're aware of that evidence." <u>See id.</u>  Moreover, during voir dire, Judge Burns informed the

3    jurors that "my experience is that the prosecutors don't play hide-the-ball.  If there's something adverse or

4    that cuts against the charge, you'll be informed of that.  *They have a duty to do that*." <u>See</u> Exh. C at 14-15

5    (emphasis added).  Thus, if the exculpatory evidence existed, it necessarily would have been presented by

6    the "duty-bound" prosecutor, because the grand jurors "can expect that the U.S. Attorneys that will appear

7    in from of [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented

8    to you." <u>See</u> Exh. B at 27.

9         These instructions create a presumption that, in cases where the prosecutor does not present

10   exculpatory evidence, no exculpatory evidence exists.  A grand juror's reasoning, in a case in which no

11   exculpatory evidence was presented, would proceed along these lines:

12        (1)    I have to consider evidence that undercuts probable cause.
          (2)    The candid, honest, duty-bound prosecutor would, in good faith, have presented any such
13                evidence to me, if it existed.
          (3)    Because no such evidence was presented to me, I may conclude that there is none.
14

15    Even if some exculpatory evidence were presented, a grand juror would necessarily presume that the

16   evidence presented represents the universe of all available exculpatory evidence; if there was more, the duty-

17   bound prosecutor would have presented it.

18        The instructions, therefore, discourage investigation -- if exculpatory evidence were out there, the

19   prosecutor would present it, so investigation is a waste of time -- and provide additional support to every

20   probable cause determination: i.e., this case may be weak, but I know that there is nothing on the other side

21   of the equation because it was not presented.  A grand jury so badly misguided is no grand jury at all under

22   the Fifth Amendment.  This error, along with the other errors in instructing the Grand Jury requires

23   dismissal.

24                                            **IV.**

25                        **<u>MOTION TO PRESERVE AND INSPECT EVIDENCE.</u>**

26        Mr. Fernandez requests the preservation of all physical evidence in this case.  This includes any

27   evidence that may be destroyed, lost, or otherwise put out of the possession, custody, or care of the

28   government (or its private contractors) in this case.  <u>See</u> <u>United States v. Riley</u>, 189 F.3d 802, 806-808

(9th Cir.1999). This request includes, but is not limited to: (1) the alleged contraband involved in the case, including all samples used to conduct all tests; (2) the containers or packaging within which the contraband was discovered; (3) the results of any fingerprint analysis; (4) the defendant's personal effects; (5) any videotapes/audiotapes capturing Mr. Fernandez in this matter; (6) recorded communications made by the government related to the above captioned case, e.g., radio communications; (7) any evidence seized from the defendant or any third party; (8) the rough notes of the agents involved in the above captioned case; (9) the secondary referral slip; and (10) the vehicle driven by Mr. Fernandez. Mr. Fernandez requests that government counsel be ordered to notify the agencies and private contractors with custody of such evidence be informed of the Court's preservation order.

Further, Mr. Fernandez requests an order granting defense counsel and/or their investigators access to the alleged contraband and other evidence for the purposes of investigation, including inspection, photographing, and re-weighing of the alleged contraband if necessary. Fed. R. Crim. P. 16(a)(1)(E). A proposed Order will be provided for the convenience of the Court.

Mr. Fernandez requests that the alleged contraband be preserved until inspection and weighing by the defense is complete and that the remainder of the evidence in the case be preserved throughout the pendency of the case, including any appeals.

**V.**

**THE STATEMENTS SHOULD BE SUPPRESSED FOR**
**FAILURE TO COMPLY WITH MIRANDA.**

The Supreme Court's holding in Miranda precludes the evidentiary use of statements resulting from a custodial interrogation unless the suspect has been first advised of his or her constitutional rights. Miranda v. Arizona, 384 U.S. 436, 444 (1966). Therefore, if Mr. Fernandez was subjected to an interrogation while in custody without the benefit of Miranda warning, his statements in response must be suppressed.

**A.    The Statements Were Taken During an Interrogation.**

"[T]he term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301 (1980) (footnote omitted). There can be no doubt that Officer Boutwell's

1    questions to Mr. Fernandez regarding his ownership of the car were intended to elicit incriminating

2    responses.  After all, the inspectors already suspected Mr. Fernandez of unlawfully using the SENTRI lane

3    and smuggling narcotics into the United States when he was referred to secondary.  Officer Boutwell should

4    have known that his questions were reasonably likely to elicit incriminating responses, and thus, his

5    questions amounted to interrogation.

6    **B.    The Statements Were Taken While Mr. Fernandez Was In Custody.**

7          The Supreme Court has long held that a person is in custody when, under the totality of

8    circumstances, "a reasonable  person [would] have felt he or she was not at liberty to terminate the

9    interrogation and leave."  Thompson v. Keohane, 516 U.S. 99, 112 (1995);  see also Berkemer v. McCarty,

10   468 U.S. 420, 442 (1984) (holding that "the only relevant inquiry [to determine whether a suspect was 'in

11   custody'] is how a reasonable man in the suspect's position would have understood his situation").  The Ninth

12   Circuit case law has further elaborated the "totality of circumstances" inquiry by identifying several factors

13   that are relevant to the "in custody" determination.

14         Pertinent areas of inquiry include:

15         [1] the language used by the officer to summon the individual, [2] the extent to which he or
           she is confronted with evidence of guilt, [3] the physical surroundings of the interrogation,
16         [4] the duration of the detention and [5] the degree of pressure applied to detain the
           individual.

17

18   United States v. Beraun-Panez, 812 F.2d 578, 580 (9th Cir.), modified by 830 F.2d 127 (9th Cir. 1987);  see

19   also Hayden, 260 F.3d at 1066.

20         Other factors may also be pertinent to, and even dispositive of, the ultimate determination whether

21   a reasonable person would have believed he could freely walk away from the interrogators;   the

22   Beraun-Panez/Hayden factors are simply ones that recur frequently.  United States v. Kim, 292 F.3d 969 (9th

23   Cir. 2002).  Based upon a review of all the pertinent facts, the court must determine whether a reasonable

24   innocent person in such circumstances would conclude that after brief questioning he or she would not be

25   free to leave.  United States v. Booth, 669 F.2d 1231, 1235 (9th Cir. 1981).

26

27

28

1    Here, prior to the questioning by Officer Boutwell in secondary, Officer Exconde told Mr. Fernandez

2    that he had violated the law.  Officer Exconde then ordered Mr. Fernandez to go to secondary inspection.[8]

3    At that point, a reasonable individual would not have felt free to leave.

4    **VI.**

5    **MOTION TO SUPPRESS EVIDENCE GAINED FROM THE**
     **WARRANTLESS SEARCH MR. FERNANDEZ' CELLULAR PHONE.**

6

7    Mr. Fernandez moves this  Court to suppress evidence based on the  illegal search (or possibly

8    multiple searches) of Mr. Fernandez' cellular telephone ("cell phone") in violation of the Fourth Amendment

9    of the United States Constitution.  Agents conducted a thorough search of Mr. Fernandez' personal cell

10   phone and the data stored therein at least once.  Without Mr. Fernandez' consent, an agent scrolled through

11   both the contact list stored in the phone and examined the list of recent calls.  After retrieving this data via

12   a search, the agent memorialized this in written format after conducting the illegal search, presumably in

13   order to conduct further investigation.  See Government Discovery Page 38, Exh. A.

14   **A.    Mr. Fernandez Has A Reasonable Expectation Of Privacy In His Cell Phone.**

15   At least one district court in this circuit has recognized the private nature of cellular phones.

16   "[M]odern cell phones record incoming and outgoing calls and can also contain address books, calendars,

17   pictures.  Individuals can store highly personal information on their cell phones and can record their most

18   private thoughts . . . ." United States v. Park, 2007 WL 1521573 at 8 (N.D.Cal. 2007) (unpublished).  This

19   accords with the Supreme Court's longstanding view that an expectation of privacy be one "that society is

20   prepared to recognize as 'reasonable.'" Katz v. United States, 389 U.S. 347, 360 (1967) (Justice Harlan,

21   concurring).  As cellular telephones become more and more capable of storing large quantities of data,

22   individual's subjective expectation of privacy in the phone becomes greater.  Society in turn regards that as

23   reasonable.  Recent years have given rise to recognition by courts and Congress that data stored on cell

24   phones and other personal electronic devices should not be accessed by the government without a warrant.

25   See, e.g., United States v. Reyes, 922 F.Supp. 818 (S.D.N.Y. 1996) (Eletronic Communications Privacy Act

26

27

28   [8] A review of the discovery reveals that Officer Exconde told Mr. Fernandez that the "SENTRI lane can only be used by authorized participants who have been enrolled in the program."

1   applies to data stored in a pager); <u>United States v. Stroud</u>, 45 F.3d 438 (9th Cir. 1994) (individual has

2   reasonable expectation of privacy in data stored in a pager) (unpublished opinion).

3   **B.    Agents Had Neither a Warrant Nor Consent When He Searched Mr. Fernandez' Phone.**

4          Mr. Fernandez did not consent to a search of his phone, and it appears that the Agents who searched

5   his phone did not obtain a warrant prior to the search.  A cellular phone is a personal possession that has

6   "fourth amendment protection at the station house." <u>Park</u>, 2007 WL 1521573 at 9 (citing <u>United States v.</u>

7   <u>Monclavo-Cruz</u>, 662 F.2d 1285, 1291 (9th Cir. 1981).  The agents were required to—but did not—obtain

8   a warrant before they searched Mr. Fernandez' cell phone.  <u>Park</u>, 2007 WL 1521573 at 1.

9   **C.    No Exception To the Warrant Requirement Applies**.

10         **1.    The Search Was Not "Incident to Arrest."**

11         The Fourth Amendment protects individuals against unreasonable searches and seizures. U.S. Const.

12  Amend. IV.  A warrantless search is "*per se* unreasonable . . . subject only to a few specifically established

13  and well-delineated exceptions." <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 219 (1973) (citations omitted).

14  The government bears the burden of establishing that a warrantless search was reasonable and did not violate

15  the Fourth Amendment. <u>United States v. Carbajal</u>, 956 F.2d 924, 930 (9th Cir. 1992) (citations omitted).

16         A "search incident to arrest" is an exception to the general rule against warrantless searches.  <u>See</u>

17  <u>Chimel v. California</u>, 395 U.S. 752 (1969);  <u>United States v. Hudson</u>, 100 F.3d 1409, 1419 (9th Cir. 1996).

18  <u>Chimel</u> created an exception to the warrant requirement, based on the danger of arrested suspects being

19  armed or having evidence capable of destruction, and the officers' interest in disarming a suspect or

20  preventing the destruction of evidence.  <u>See</u> <u>Chimel</u> at 773 ("There is always a danger that the suspect will

21  [possess] weapons with which to overpower and injure the arresting officers, and there is a danger that he

22  may destroy evidence ").

23         The "search incident to arrest" doctrine does not except searches of "possessions within an arrestee's

24  immediate control" that are not part of "the person." <u>United States v. Chadwick</u>, 433 U.S. 1, 16 n. 10 (1977).

25  A cell phone is a possession within an arrestee's immediate control, and thus a search of the cell phone

26  "cannot be justified by any reduced expectations of privacy caused by the arrest." <u>Id.</u>; <u>see also</u> <u>Park</u>, 2007

27  WL 1521573.

28

1    While it is unclear from the record when the search of the cell phone occurred, from the discovery

2  it appears that the search was remote in time from the original arrest.  Indeed, the cell phone was not

3  searched in the presence of Mr. Fernandez at any time before, during or after his interrogation.  Nor did Mr.

4  Fernandez consent to a search of his phone.  The search of Mr. Fernandez's phone was simply a standard

5  search by the agents, who were seeking further evidence of criminal activity.  Such a search is not covered

6  by the Chimel exception.

> Warrantless searches of property seized at the time of an arrest cannot be justified as
> incident to that arrest either if the search is remote in time or place from the arrest, or no
> exigency exists.  Once law enforcement officers have reduced luggage or other personal
> property not immediately associated with the person of the arrestee to their exclusive
> control, and there is no longer any danger that the arrestee might gain access to the property
> to seize a weapon or destroy evidence, a search of that property is no longer an incident of
> the arrest.

11  Park, 2007 WL 1521573 at 6.  As in Park, Mr. Fernandez' cell phone was in the exclusive control fo the

12  government, it could not be accessed by Mr. Fernandez, and the search was not "incident to arrest."

13       **2.    The Search of the Cell Phone's Memory Was Not An Inventory Search.**

14    The search was not an inventory search, and hence did not fall under the "inventory" exception to

15  the warrant requirement.  Courts have "consistently sustained police intrusions into automobiles impounded

16  or otherwise in lawful police custody where the process is aimed at securing or protecting the car and its

17  contents."  South Dakota v. Opperman, 428 U.S. 364, 373 (1976).  An inventory search of an automobile

18  conducted without a warrant, however, is strictly limited.  An inventory search cannot "be a ruse for a

19  general rummaging in order to discover incriminating evidence."  Florida v. Wells, 495 U.S. 1, 3 (1990).

20  Where an inventory search is merely a pretext for "general rummaging," suppression of evidence is the

21  appropriate remedy.  On this basis, the Ninth Circuit has ruled that a warrantless search of personal baggage

22  after completion of an inventory search was not covered by the Chimel exception.  See Monclavo-Cruz, 662

23  F.2d at 1288-89 (citing Preston v. United States, 376 U.S. 364, 367 (1964) (holding that warrantless searches

24  of luggage or other property seized at the time of an arrest is not incident to that arrest if the "search is

25  remote in time or place from the arrest")); see also United States v. Bowhay, 992 F.2d 229 (9th Cir. 1993)

26  ("an inventory search is invalid if it was a pretext for an investigative search"); United States v. Thompson,

27

28

1  29 F.3d 62, 65 (2d Cir. 1994) ("The fruit of inventory searches . . . will be suppressed when the searching

2  agents act in bad faith or solely for the purpose of investigation").

3       The government's search of the memory of Mr. Fernandez' cell phone was not an inventory search

4  because the agents "mine[d] the [cell phone] for information rather than to ascertain whether they contained

5  property to be safeguarded." United States v. Wiseman, 158 F.Supp.2d 1242 (D. Kan. 2001). The agents'

6  motivation and reason for the search was purely investigatory. Because the search was conducted without

7  a warrant, and no exception to the warrant requirement applies, the evidence—and all the fruits

8  thereof—must be suppressed at trial.

9  **D.    All Evidence Seized as a Result of the Unlawful Searches and Seizures Must Be Suppressed.**

10       This Court should suppress all evidence discovered as a result of the unlawful search and seizure of

11  Mr. Fernandez' cell phone. "It is well established that the Fourth Amendment's exclusionary rule applies

12  to statements and evidence obtained as a product of illegal searches and seizures." United States v.

13  Crawford, 372 F.3d 1048, 1054 (9th Cir. 2004) (citing Wong Sun v. United States, 371 U.S. 471  484-88

14  (1963)). "Evidence obtained by such illegal action of the police is 'fruit of the poisonous tree,' warranting

15  application of the exclusionary rule if, 'granting establishment of the primary illegality, the evidence to

16  which instant objection is made has been come at by exploitation of that illegality or instead by means

17  sufficiently distinguishable to be purged of the primary taint.'" Id. (citing Brown v. Illinois, 422 U.S. 590,

18  599 (1975)). Furthermore, any statements made by Mr. Fernandez in response to questions that involved

19  the fruits of the cellular phone search must be suppressed per Wong Sun.

20       Because Agents failed to obtain a warrant or Mr. Fernandez' consent prior to searching and seizing

21  the electronic data, and because the search is was neither a permissible search incident to arrest, nor an

22  inventory search, all evidence seized or derived from the unlawful search must be suppressed.

23                                          **VII.**

24                  **MOTION FOR LEAVE TO FILE ADDITIONAL MOTIONS.**

25

26

27

28

1    Defense counsel requests leave to file further motions and notices of defense based upon

2  information gained in the discovery process.  On April 1, 2008 counsel received seventy-one pages of

3  discovery from the government in this matter.[9]

4                                                **VIII.**

5                                          **CONCLUSION.**

6    For these and all the foregoing reasons, Mr. Fernandez respectfully requests that this Court grant

7  his motions and grant any and all other relief deemed proper and fair.

8                                              Respectfully submitted,

9

                                              _/s/ David M.C. Peterson_____
10  DATED: April 7, 2008                      DAVID M.C. PETERSON
                                              Federal Defenders of San Diego, Inc.
11                                            Attorneys for Mr. Fernandez
                                              E-mail: david_peterson@fd.org
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26  _____

27    [9]  Defense counsel, however, forwarded a written request for discovery to the government in a letter
    dated March 6, 2008.
28

1

**APPENDIX OF EXHIBITS**

2

<u>United States v.  Jose Juan Fernandez</u>

3

08CR0802-JAH

4

Exhibit A  . . . . . .   Cell phone records extracted from cell phone following search, Gov't Discovery p. 38

5

Exhibit B  . . . . . . . . . . . . . . . . . Reporter's Partial Transcript of the Proceedings, dated January 11, 2007

6

Exhibit C  . . . . . . . . . . . . . . . . . . . . . . .   Reporter's Transcript of Proceedings, dated January 11, 2007

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**CERTIFICATE OF SERVICE**

2

3        Counsel for Defendant certifies that the foregoing is true and accurate to the best information and

4 belief, and that a copy of the foregoing document has been caused to be delivered this day upon:

5        Courtesy Copy to Chambers

6        Copy to Assistant U.S. Attorney via ECF NEF

7        Copy to Defendant

8 Dated:  April 14, 2008                    /s/ DAVID M. PETERSON
                                          Federal Defenders of San Diego, Inc.
9                                         225 Broadway, Suite 900
                                          San Diego, CA  92101-5030
10                                        (619) 234-8467  (tel)
                                          (619) 687-2666  (fax)
11                                        David_Peterson@fd.org (email)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28